Commonwealth *v.* Jennings, Appellant.
Commonwealth *v.* Harris, Appellant.

Argued November 15, 1937.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, James and Rhodes, JJ.

*Arthur Garfield Hays* and *Francis Biddle*, with them *R. A. Hubler, Dudley Field Malone, Davis R. Hobbs* and *E. K. Herskovitz*, for appellants.

*Thomas M. Lewis*, with him *M. F. McDonald*, for appellee.

OPINION BY KELLER, P. J., January 27, 1938:

Emerson Jennings and Charles Harris, alias Joe Harris, were jointly indicted and tried on the charge of having on March 28, 1935 feloniously, etc., by the explosion of dynamite and other explosive substances, placed in, under and against an automobile, the property of W. A. Valentine, in the custody of Mary Valentine, (1) attempted to do bodily harm to the person of Mary Valentine; (2) damaged and destroyed said automobile of W. A. Valentine; (3) done bodily harm to one Charles Smith; (4) damaged and destroyed the property of the Miners National Bank of Wilkes-Barre; and (5) damaged and destroyed the property of the Wyoming National Bank of Wilkes-Barre.

When the case was brought to trial on October 6, 1936 Jennings pleaded 'not guilty' and claimed that he was the victim of a 'frame-up.'

Harris pleaded guilty on September 27, 1935, but afterwards, having been apprehended, following an

escape from custody, to which we will later refer, by leave of court withdrew that plea and on October 6, 1936, entered a plea of 'not guilty.' He testified on the trial that he was employed by certain agents of the Commonwealth to 'frame' Jennings; that his confessions implicating Jennings with the commission of the crime charged in the indictment were false and were made as a part of the 'frame-up'; and that neither he nor Jennings were concerned in the perpetration of the alleged crime.

On October 18, 1936, the jury returned a verdict of guilty against both defendants on counts 1 and 2, and acquitted them on the other three counts.

From the refusal of the court below to grant a new trial the defendants have separately appealed.

The preliminary details leading up to the indictment were as follows:

On March 28, 1935, at 4:30 o'clock in the afternoon Judge W. A. Valentine's daughter Mary, who was employed as librarian at the Meyers High School, drove her father's car, bearing license plates '264 Judiciary', to the Miners National Bank, corner of Market and Franklin Streets, Wilkes-Barre, and parked it on Franklin Street, just at the corner. She hurried into the bank to get a check cashed, as it was about closing time, and as she was leaving, about four minutes later, a terrible explosion occurred which wrecked the car. Miss Valentine had used the car to drive from her home to the Meyers High School at 8:00 o'clock that morning and had parked it on Hanover Street until 4:20 P. M., when she left the school with two girl pupils, whom she took to their homes, and then drove to the bank by way of her own home, where she stopped for a minute to get something. The theory of the Commonwealth was that a bomb had been placed under the hood of the car while it was parked near the school on Hanover Street,

but, apparently, no pieces of a bomb or timing device were found by the police.

On August 2, 1935 Alderman Brown of Wilkes-Barre issued his warrant to Constable Thomas McHale for the arrest of Charles Harris, alias Joe Harris, charged with having, on March 28, 1935, (1) conspired to do an unlawful act, to wit, the carrying and possession of a bomb, with unlawful intent; (2) unlawfully, etc., attempted to do bodily harm to Mary Valentine, by the explosion of dynamite or other explosive substance placed or thrown in or under a certain automobile owned by Mary Valentine; and (3) possessed and carried on his person and vehicle under his control, a certain bomb with the intent to use the same unlawfully against the person and property of another. The warrant was issued on complaint of Leo Grohowski, County Detective, but the record before us fails to show when Grohowski made the affidavit. Harris was not arrested on this warrant until August 17, 1935, although he appears to have been in the custody of the County Detective during at least a part of the intervening period. A hearing was had on August 17, 1935 and Harris was committed to the county prison in default of $15,000 bail for his appearance at the next term of the Court of Quarter Sessions. Transcript was filed in said court to No. 626 September Sessions, 1935.

On August 3, 1935 an information under oath was made by Richard Powell before Honorable John S. FINE, additional law judge of Luzerne County, charging that Emerson Jennings, Charles Harris, alias Joe Harris, Gerald Williams and John Doe on March 28, 1935 (1) did conspire to do an unlawful act, to wit, injure the person of another by the explosion of dynamite or other explosive substance; and (2) did conspire to do an unlawful act, to wit, the carrying and possession of a bomb with intent to use the same unlawfully; and (3) did unlawfully, etc., by the explosion of dyna-

mite or other explosive substance, placed or thrown in, upon, under or near a certain automobile owned by Mary Valentine, attempt to do bodily harm to the said Mary Valentine and other persons unknown; and (4) did possess and carry on their persons and vehicles under their control, a certain bomb with the intent to use the same unlawfully against the person and property of another.

The name 'John Doe' in this information was used to designate one Thomas Lynott, alias Sullivan, alias McHale. In order not to confuse him with Thomas McHale, the constable, and Richard B. McHale, the court stenographer, we shall call him by his real name, Lynott, although he was known to Jennings only as McHale. A warrant issued to Officer John J. Dempsey the same day. It does not certainly appear that this warrant was served on anybody but Jennings, although the others were within easy reach. As a matter of fact Jennings was arrested the night before the warrant issued, in the company of Harris and Lynott, and Jennings was intentionally left under the impression that all of them had been taken into custody at that time by the arresting officers. At the hearing of Jennings before Judge FINE, Williams whose real name was Fred Buckner[1], testified that Jennings, shortly prior to March 28, 1935, offered him $300 to place a bomb in the Valentine car; that he had refused, and was told by Jennings, a week later, after the explosion, that he had got somebody else, a fellow named Joe, to do the job for less than he had offered Williams; that he had subsequently met 'Joe' at Jennings' office and been paid money by Jennings for keeping quiet. On the strength of this testimony Judge FINE held Jennings under bail for his appearance at the next term of quarter sessions court, to No. 627 September Sessions, 1935. Without

---

[1] We shall continue to call him by the name he first used, Gerald Williams.

Williams' testimony he could not have been held. Bail was fixed at $15,000, which was furnished. The prosecution went through the form of asking Williams and Lynott if they desired a hearing, to which they replied they did not. This was evidently done solely for the effect on Jennings, for they were not then in custody and were not required to give bail for their appearance at court on these charges. It is proper to add that Williams' testimony in respect to his name, residence, occupation, his denial of acquaintanceship with Lynott, who had known him for over ten years and had been with him in the Hotel Sterling the day before, and other preliminary details was false, and was known to be such by the county detective, Grohowski, and by Lynott, who was really acting as an investigator, employed with the approval of the court, to endeavor to find the perpetrator of the crime referred to in the complaint and information abovementioned, but the committing judge was not informed of the falsity of this testimony.

On August 27, 1935, the district attorney, Thomas M. Lewis, Esq., on showing to the court that the offense charged against Charles Harris, alias Joe Harris, in the transcript filed to 626 September Sessions 1935 and that charged against Emerson Jennings in the transcript filed to 627 September Sessions, 1935 were the same and grew out of the same transaction, on the same date, with the same prosecutor, was permitted to merge and join both transcripts in a joint bill of indictment to 626 September Sessions 1935, which was the indictment on which appellants were tried. The Commonwealth's witnesses endorsed on the indictment were Leo Grohowski, Mary Valentine, Martha Bellas [a friend of Mary Valentine], Charles Smith [who was alleged to have been injured by the explosion] and Gerald Williams. A true bill was found on August 27,

1935, to which Harris, on September 27, 1935 pleaded guilty and was remanded for sentence.

At the same time (August 27, 1935) true bills were found against Jennings and Harris jointly, based on the abovementioned complaint and information, charging them with unlawful possession of explosives, (No. 626-A September Sessions 1935) and conspiracy to do an unlawful act (No. 626-B September Sessions 1935). These indictments have not been tried.

The defendant Jennings made demand for an immediate trial and all three indictments were placed on the September 1935 trial list. They were not tried then, however, because through the negligence, if not collusion, of the County Detective, Grohowski—who, by some means not appearing in the record, had been permitted to take Harris away from the county prison on trips to Bear Creek, Tunkhannock, Scranton and New York, and had left him alone in a hotel room with Williams— Harris escaped by walking out a day or two before the time set for the trial, under circumstances which would have justified the prosecution of the persons responsible for the escape (see Act of March 31, 1860, P. L. 382, sections 5 and 6; *Com. v. Norris*, 87 Pa. Superior Ct. 66). Although Harris had not testified at the hearing of the charge against Jennings, the district attorney was not willing to proceed to the trial of Jennings without him, alleging that he was a material witness for the Commonwealth, and the cases were continued from time to time. Harris was retaken into custody in the latter part of July, 1936, and returned to the county prison, and on July 31, 1936 asked leave to withdraw his previous plea of guilty, which was allowed, as before stated.

To understand fully the circumstances of the case it is necessary to make some reference to the troubles existing in the Anthracite Coal field in Luzerne County because of a dispute or war between two rival labor

unions, the old union, United Mine Workers of America, and a new union, Anthracite Miners of Pennsylvania. As a result of this trouble a reign of terror, violence and bloodshed existed which affected the whole community. The homes of many miners had been dynamited or bombed resulting in the death or injury of the occupants and the destruction of property. Other miners had been beaten and threatened with physical violence. Intimidation and terror were widespread. In an effort to abate the disorder and violence the Glen Alden Coal Company filed a bill in equity to restrain Anthracite Miners of Pennsylvania from doing certain things, not necessary to be gone into here, and Judge Valentine had issued a temporary restraining order. The validity of this action is not a relevant matter here. If error was committed the orderly remedy was by appeal. Among those who strenuously opposed this suit and the restraining order issued under it was the defendant, Jennings. He was not a miner. He was a job printer, who also from time to time printed a small paper called 'The Citizen'. Jennings was not a lawyer but he had an exalted idea of his knowledge of the law and the constitution and placed his own interpretation of them above the rulings and decisions of judges and the courts, including even the highest, the Supreme Courts of this Commonwealth and of the United States. He was a sort of self constituted guardian of what he considered were the constitutional rights of the people and as his ideas of these frequently differed from the rulings of the courts he was often in conflict with the judges. Any judge who differed from his interpretation of the law or the constitution was liable to be publicly assailed. He had had a number of such conflicts with Judge Valentine going back as far as 1931 and as a consequence exhibited towards Judge Valentine manifestations of a deep and settled personal animosity, culminating in an attempt made a month or so after the

bombing to have him impeached and driven from office. It is unnecessary to refer in detail to these disputes or the unfounded and unreasonable grounds for Jennings' attitude. A review of Judge Valentine's judicial record should satisfy any unprejudiced person as to his ability, probity and rectitude as a judge. Jennings' relations with the other judges of Luzerne County were not as strained as they were with Judge Valentine but they were distinctly hostile.

At the time of the explosion a rule was pending in the beforementioned equity suit to show cause why certain persons, including Jennings, should not be adjudged in contempt of court for violating the restraining order. It was alleged, inter alia, that he and one Henry Schuster of Scranton had been guilty of contempt of the court's order by printing and distributing circulars counselling the defendant miners to disregard and disobey the restraining order. The quality of his legal reasoning is best seen from his contention that because the circulars were *printed* in Lackawanna County, their *distribution* in Luzerne County was outside the jurisdiction of the courts of Luzerne County.

In the latter part of May 1935, Thomas Lynott represented to certain influential persons in Wilkes-Barre that he thought he would be able to find out who had bombed Judge Valentine's car. He had worked as an investigator for the Lackawanna Railroad Co. in 1934 and 1935. He had previously worked for the railroad in other capacities. He had "run alcohol", that is, had been a bootlegger, since the repeal of prohibition. He was apparently familiar with the jargon or lingo used by criminals. In any event he was recommended to the judges of the Luzerne County Courts as an investigator and was hired by them early in June 1935 to work on the Valentine bombing case. As such he became associated with Leo Grohowski, the county detective, in the work of running down the bomber. Whether

he had known or had previous relations with Grohowski does not appear.

Pursuant to arrangement with Grohowski, Lynott early in June, under the name, Thomas McHale, engaged room No. 60 in the Sterling Hotel, Wilkes-Barre. Room No. 59, which adjoined room 60, was taken by Grohowski, who had the two rooms wired for a dictaphone, or dictagraph—we will call it the former—so that anything said in room 60 would be inscribed on wax cylinders in the dictaphone machine in room 59. The dictaphone also had earphones connected to it, and two court stenographers, R. B. McHale and Warren J. Yeisley, were delegated to take down the conversations occurring in room 60 in shorthand  Lynott knew that the dictaphone had been thus installed in room 59, but testified that he did not know that stenographers were also taking down the conversations in shorthand. Room 58 which adjoined and communicated with room 59 was also reserved by Grohowski for the use of police officials. Yeisley was present in room 59 and took down in shorthand the conversations taking place in room 60 on July 24, 25, 26, 27 and 29. McHale took down the conversations on August 2. On some days both stenographers were present. The dictaphone was installed early in June but we have no record of any conversations until July 24. It was on August 2, while Lynott, Jennings and Harris were in room 60, the stenographer McHale and a dictaphone mechanic in room 59 and Grohowski and the Chief of Police and other police officers in room 58, that the raid was made on room 60 resulting in the arrest of Jennings as before recited.

The case came up for trial on October 6, 1936 before Honorable SAMUEL E. SHULL, President Judge of the 43d Judicial District, specially presiding. It was a long and arduous trial. It was fairly conducted and well tried. The defendants were represented by able

and distinguished counsel from New York and Phila-
delphia. The special attorneys assigned by the At-
torney General to conduct the prosecution were fair in
their presentation of the case and did not overstep the
line of prosecuting attorneys. And the trial judge was
eminently fair to and regardful of the rights of the ac-
cused. His conduct was such as to deserve the state-
ment which defendants' counsel made at the conclu-
sion of the case, that the defendants had had a fair
trial. In our examination of the record we have dis-
covered no reversible error on the trial except the re-
fusal to direct the production of Lynott's itemized ac-
count of his expenses as paid by the county. This
itemized account was not, in our opinion, a private
paper of the District Attorney, nor of the judge who
approved its payment. It was a record of the expendi-
ture of county funds, which for obvious reasons could
not, and ought not to be made public while the investi-
gation was in progress, but, on its completion and at
the trial resulting in consequence, it was a county
record which Jennings was entitled to have access to
and use if it showed payments made by Lynott to
Harris and Williams, as corroborating his defense of a
frame-up. As we are going to grant a new trial on
another ground, we shall not enter into further discus-
sion of the matter, but if the case comes up for a re-
trial, our present opinion is that the defense should be
furnished, on their request, with the itemized list of
Lynott's expenses paid by the county; and the same
thing applies to any itemized account covering the lump
payment to Grohowski for Lynott's account.

The evidence on the trial, if believed by the jury, was
sufficient to warrant a verdict of guilty. Williams,
who had testified at the preliminary hearing as to con-
versations with Jennings connecting him with Harris
in the blowing up of the automobile, did not testify at
the trial in court. He had been subpoenaed by the Com-

monwealth and was in court for a number of days but, later, had been excused from further attendance at court by the Commonwealth's officers. The defense, early in the trial, became aware that he would repudiate his testimony before Judge FINE, and, when called, would testify that his former testimony was false and perjured and had been made up at the instance of Lynott, but he was not subpoenaed as a witness by the defendants and when their turn came to offer evidence he was out of the jurisdiction and not available as a witness for them. The confessions of Harris implicating Jennings as having employed him to plant the bomb, having been made in his absence, were of course, not admissible in evidence against Jennings, and were repudiated by Harris on the trial. The evidence linking Jennings and Harris with the perpetration of the crime was furnished by Lynott, who had not been called as a witness at the preliminary hearing or before the grand jury. He testified that, after his employment as investigator by the Luzerne County Court, he had called at Jennings' printing office and had said to him: "I am on the lam out of New York. I am hot and I heard you were O. K." He explained that a man who was 'on the lam' was one whom the police of another city were looking for, and that he had left that town so that he would not be caught; and that a fellow who was 'hot' was one who would do almost anything; that he understood that Jennings was O.K. and might have a job for him. He also gave him a telephone number in New York, which he said would show Jennings that he was all right. Jennings told him not to come to his office, but subsequently met him at the Sterling Hotel, had dinner with him and afterwards they sat together in the lobby where Jennings in a loud voice criticized certain lawyers and judges, including Judge Valentine, accusing him of corrupt conduct with respect to the county's printing contracts.

Lynott tried to quiet him down because they were sitting right out in the lobby and finally he said to Jennings: "Come on, get out of here. We will get pinched. The cops will be on us.—So I took him, we started to walk out, and walked to the back of the hotel, going through the parking lot. There Mr. Jennings stopped and said, you are willing to do anything? I said, I don't draw the line on many things. He said—he was all nervous—he said, I will pay you $3000 if you take care of the judge, take him out of the picture."

The trial judge in his charge told the jury: "Unless you believe the testimony of McHale [Lynott] to the effect that Jennings asked him, and offered him $3000, to blow up Judge Valentine, or his car, or his family, then we say to you that you should acquit Jennings. We will say this to you: the mere fact that you might not believe some of the details of the story as told by McHale [Lynott] is not at all a controlling factor, but the real substance of the McHale [Lynott] testimony is that Jennings arranged with him to have Judge Valentine put out of the way and he was to pay him $3000. Unless you believe that to be true, you should acquit Jennings, the defendant." (Record, p. 1569). We do not agree with the learned trial judge on this point, but as his charge, in this respect, was favorable to the defendant, Jennings, rather than, otherwise it is not reversible error. The testimony of Lynott as to Jennings' offer to pay him $3,000 "to take Judge Valentine out of the picture" related to some future action, not to the explosion or crime for which the defendants were being tried. It was relevant and important, if believed, as tending to show that Jennings' animosity against Judge Valentine was not confined to an effort to drive him from the Bench, but included personal violence to him. But the most important part of Lynott's testimony—that connecting Jennings directly with the bombing of March 28, 1935—related to certain

alleged statements by Jennings that "the last time he had had the job done ...... the boy that done the job couldn't get at the Judge, he was too well guarded", and "that by hurting the Judge's daughter ...... it was hurting him also"; and that Jennings had talked to him about the bombing and said that a couple of people were shaking him down. It is not necessary for us to give in detail the substance of Lynott's testimony. It is sufficient to say that it furnished the necessary connection between Jennings and Harris and the explosion of March 28, 1935; that this connection was furnished by no other witness, and, that without Lynott's testimony the conviction of Jennings could not stand. Jennings, on the stand, denied Lynott's testimony. His version of the story was that Lynott had come to see him representing that he was interested in the establishment of a labor newspaper and that all the conferences that were had between them were with reference to this paper, which would be printed and published by Jennings; that the publishing of this paper, through moneys furnished by Lynott, would help to bring about a successful outcome to his proceeding against Judge Valentine; that contrary to Lynott's testimony he had never met or had any dealings whatsoever with Harris until the night of August 2, when at the Sterling Hotel Lynott introduced him to Harris, the same evening that the room was raided by the police.

It is evident that the jury believed Lynott and disbelieved Jennings. They were influenced, no doubt, by Jennings' conduct during the course of the trial (194a, 705a, etc.) and by his unjustified aspersions on the character of Judge Valentine and the other judges of Luzerne County which were introduced in evidence to show motive and wicked intent. In any event, the jury accepted Lynott's testimony as true and without it

there could not have been a valid conviction of Jennings.

The motion for a new trial was based on certain alleged errors of the court in the admission and rejection of evidence and also, informally, on the ground of after-discovered evidence. As to the errors on the trial, we have already said that, with the exception of the court's action with reference to Lynott's itemized bill of expense, we found no reversible error by the court below. A new trial was asked on the ground of after-discovered evidence relating to three different subjects: (1) That Williams had repudiated his testimony given at the preliminary hearing before Judge FINE and, if called, would testify that his testimony at the hearing was false and perjured throughout and had been made up by Lynott. At the hearing on the motion for a new trial Williams appeared and testified that his evidence at the preliminary hearing was fabricated and false in practically every particular; that he had never met or spoken to Jennings until the preliminary hearing before Judge FINE; that the whole story had been concocted by Lynott, who had rehearsed it with him in the Hotel Sterling and who, subsequently, had threatened to send him to jail if he did not repeat his false testimony at the trial; but that although he recognized that he was subjecting himself to a prosecution for perjury he repudiated his former testimony in toto. The difficulty with this testimony is that it was not after-discovered within the rule laid down by the decisions (see *Com. v. Mellon*, 81 Pa. Superior Ct. 20, 25, and cases there cited) for the defendants' attorneys were made aware during the course of the trial, by Williams himself, that he had repudiated his testimony given at the hearing before Judge FINE and if called by the Commonwealth would 'come clean' and testify that the story told by him was utterly false; that he had never spoken to Jennings before August 3d and that Jen-

nings had never asked him to bomb the Valentine car or said or done anything connecting him with the Valentine explosion. With full knowledge of this fact, they neglected to subpoena Williams as a witness. The rule laid down in *Com. v. Mellon* supra, and the cases cited therein, has no reference to the discovery, within the term, of fraud or perjury on the trial: *McCabe v. Penna. R. Co.*, 311 Pa. 229, 166 A. 843; *Candelore v. Glauser*, 291 Pa. 582, 140 A. 525; but Williams did not testify on this trial and as the defendants, probably, did not subpoena him because they wanted the advantage of calling him as a witness subpoenaed by the prosecution, they had only themselves to blame if he was not present when they needed his testimony. (2) At the hearing for the new trial the defendants presented the testimony of Jay Fuller and Helen Keating to the effect that they saw two young men tampering with the Valentine automobile as it stood outside the Miners Bank Building just before the explosion. The defendants knew of these witnesses, had subpoenaed them for the trial, but did not use their testimony because they did not wish to undertake the burden of showing how the explosion occurred. By no stretch of the imagination can this evidence be called after-discovered. (3) The conversations that took place in room 60 between Lynott and Williams, and Lynott, Harris and Jennings, respectively, or some of them, were taken down on wax cylinders on the dictaphone machine. The person who installed the dictaphone and checked it up from time to time said that it was working, yet when the case was brought to trial the dictaphone wax cylinders had been used so many times, or were in such condition, that very little that was intelligible could be obtained from them. Apparently no one connected with the prosecution had ever heard these records played. No one in the district attorney's office had played them over and the conversations inscribed upon the wax cylinders had

600

not been transcribed on paper. Notwithstanding this, someone, apparently, played them so often that they could not be intelligibly reproduced in court. Mr. Lewis, former district attorney and now special attorney for the Commonwealth (p. 229a) offered to bring in the dictaphone records "for whatever they might be worth"; but both sides agree that the dictaphone wax cylinders were in such condition as to shed little light on the subject. Oscar J. Thomas, who installed the dictaphone, testified as follows: "Q. [by Mr. Hays, Counsel for Jennings] So that anything that was said in room 60 would appear in the phonographic record that you had in room 59? A. That is subject to qualification. You can't answer that question without an explanation. Q. You mean you can't answer whether it was working efficiently? A. Yes, sir; that depends upon whether the people in 60 talked loud enough for recording. Q. If they talked loud enough to get it on the ear phone I suppose they talked loud enough for recording? A. Not necessarily. Q. You mean to hear? A. Yes. Well, the ear phone is much more sensitive than the recording units. We have to have definite power—Q. Did you tell that to the people who employed you? A. Yes, sir. Q. So that if they wanted to take this correctly they would have more of a chance of getting a record by stenographers and taking it down on ear phones? A. Yes, both. We figured that they were both there and the job would be one hundred per cent. Q. That they were both there? A. We suggested that. Q. You don't know whether they did or not? A. I never saw anybody there writing it down when I was there.

Mr. Hays: I call for the production of any stenographic notes by any stenographer taken by ear phones, if there were such ......

Mr. Hays: Well, I ask Mr. Lewis if there is any steno-

graphic record of anything taken by a stenographer over ear phones.

Mr. Lewis: I have never seen any record, if your Honor please.

Q. [to the witness] But you advised them that in order to be sure about what was going on in there and to get it properly it would be better to have stenographers with ear phones as well as phonograph records? A. That's right ......

Mr. Lewis: If I may interrupt you, I might add to my previous statement to the Court that I had not seen any notes, that I was advised that two stenographers, Messrs. McHale and Yeisley, court stenographers, listened in on these ear phones at least on more than one occasion, and I personally consulted both these stenographers and asked them if they had anything that they heard over the dictaphone at that time, and both advised me that they had not transcribed their records because they had nothing tangible and nothing coherent, suitable to place on any transcript.

Mr. Hays: I thank you very much."

In consequence of Mr. Lewis' statement that he had been informed by the court stenographers that they had not transcribed their records because they had nothing tangible and nothing coherent, suitable to place on any transcript, the court stenographers were not called by the defendants as witnesses. If called, their testimony would have been competent and admissible.

At the hearing on the motion for a new trial Yeisley was called and read his notes of what had been taken down in room 59 by the ear phones on July 29, and was examined as to certain parts of the transcript, and a transcript of McHale's notes of August 2 was presented and read. The testimony so produced substantiated much that Jennings had sworn to on the trial and discredited and refuted much that Lynott had testified to. These notes support Williams in his testimony

on the rule that he and Lynott had rehearsed in room 60 the testimony that he was to give before Judge FINE at the preliminary hearing. They refuted Lynott's testimony that he and Jennings had not discussed the establishment of a paper and showed that that was what Jennings and he were talking about. They tended to support Jennings' testimony that he had not met Harris until in Lynott's room on August 2; that up to that time Harris and Jennings were apparently strangers. In the meeting on July 29 Jennings indulged in a tirade against Judge Valentine and the judges and lawyers of Luzerne County. Time and again Lynott brought the conversation around to Judge Valentine, but not once did Jennings do other than speak of his efforts to drive Judge Valentine off the Bench. No word or hint of personal violence against Judge Valentine, or any member of his family, was uttered by Jennings. The notes of the meeting on August 2, as taken down by McHale, do not agree with Lynott's testimony of what occurred that night. The discrepancy between the stenographers' notes and Lynott's testimony on both occasions that Jennings was present in room 60, July 29 and August 2, is so great that it can only be accounted for by Lynott having knowledge that the dictaphone records had been rendered valueless and not knowing that the stenographers, by the use of the ear phones, were taking down notes in shorthand, or, if he had such knowledge, that he relied on the fact that the notes were incoherent and unintelligible. In our opinion the effect of these stenographic notes is to discredit Lynott's testimony and to support the contention of the defendant Jennings that he was the victim of a frame-up. The evidence does not merely impeach the credibility of the witness; it rebuts and refutes the testimony of the most important witness in vital particulars.

We have not the slightest intention of reflecting in

any way upon the conduct of Mr. Lewis or his associate, Mr. McDonald, acting as special attorneys for the Attorney General. We think that throughout the trial of this case Mr. Lewis' conduct was eminently fair. He very fairly and commendably withdrew at the hearing for a new trial all technical objections, which he might have made because of informality or noncompliance by foreign counsel with local rules of court, to the admission and consideration of this evidence offered as ground for new trial, reserving only his right to contend that it did not warrant a new trial on the ground of after-discovered evidence (pp. 19, 20, Hearing-New Trial). We are of opinion, however, that his statement made in open court,—and we are sure with the best of intentions,—that he had been informed by the stenographers that they had nothing coherent or intelligible that could be used on the trial, prevented the defense from calling McHale and Yeisley, and that this action on the part of the Commonwealth's attorney takes the case out of the ordinary rule. These were witnesses who would normally have reported the result of their work to the district attorney and been in close association with him. Where the Commonwealth's attorney, unwittingly though it may be, has misled the defendants and prevented them from calling witnesses who had been subpoenaed for the defense, by representations that their testimony would be of no value in the case, the situation is taken out of the ordinary rule and is on a different footing. Bearing in mind that nobody but Lynott testified to any criminal connection between Jennings and Harris and that if he had not testified a verdict of guilty could not have been sustained, we are of opinion that this evidence which contradicts and discredits in vital respects the testimony of Lynott was such as to require the granting of a new trial.

With this disposition of the case it will not be necessary for us to pass upon the petition filed in this court

relating to evidence discovered since the appeal was taken which it is alleged, discredits the testimony of Risenko and Steve, friends of Grohowski, who had testified that a little before three o'clock in the afternoon of March 28, 1935 as they were driving by the vicinity of the Meyers High School they saw a man, whom they afterwards identified to be Harris, on the sidewalk and a man, whom they afterwards identified to be Jennings, seated in a standing automobile near the school. Previous to that time they had never seen or known either Harris or Jennings.

While the discrediting of Lynott's testimony related for the most part to Jennings, Harris' case is so bound up with it that a new trial for the one should bring with it a new trial to the other; for the Commonwealth's whole case was based on the theory that Jennings employed Harris to plant the bomb and the statements of Harris repudiated on the trial were that he had received the bomb from Jennings who did not tell him what it was but asked him to put it under the hood of the automobile. If the prosecution against Jennings was a frame-up contrived by Lynott, with perhaps the assistance of Grohowski, then the principal *actor* in the frame-up was Harris and a new trial to Jennings should result in a new trial to Harris.

The judgment in each appeal is reversed and a new trial is awarded the defendants.